**FILED**

AUG 21 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                              DEPUTY

# UNITED STATES DISTRICT COURT
## for the
### Southern District of California

**UNSEALED PER ORDER OF COURT**

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Facebook, Inc.,
1 Hacker Way, Menlo Park, CA 94025

Case No. **18MJ4549**

SEALED

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**ATTACHMENT A**

located in the _____ District of _____, there is now concealed *(identify the person or describe the property to be seized)*:

**ATTACHMENT B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 960, 962, 952 | conspiracy to import controlled substances/importation |

The application is based on these facts:

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

JILL BRENNY, SPECIAL AGENT HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/20/18

*Judge's signature*

City and state: SAN DIEGO, CALIFORNIA

THE HONORABLE WILLIAM Q. GALLO
*Printed name and title*

## APPLICATION FOR SEARCH WARRANT

I, Jill Brenny, Special Agent, Homeland Security Investigations, being duly sworn, state:

## EXPERIENCE AND TRAINING

1. I have been employed as a Special Agent ("SA") with the Office of Homeland Security Investigations ("HSI"), Immigration and Customs Enforcement ("ICE"), since February 2010. I am currently assigned to the ICE/HSI Office of the Special Agent in Charge, in San Diego, California. I received approximately six months of training at the Federal Law Enforcement Training Center in Glynco, Georgia. During the training, I learned how controlled substances are manufactured, consumed, packaged, marketed, and distributed. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects, conducted physical surveillance, and utilized electronic and video surveillance. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking.

2. Based upon my experience and training, consultation with other law enforcement officers experienced in controlled substances, and all the facts and opinions set forth in this affidavit, I know that:

   a. Individuals involved in drug dealing must often rely on others to obtain the controlled substances and to help them market the drugs. Evidence of the identities of these criminal associates is often maintained at their residence and/or place of business and/or online presence in the form of electronic mail or social media websites.

   b. Individuals involved in smuggling narcotics may communicate utilizing electronic mail and social networking sites, such as Facebook, to coordinate with co-conspirators in order to further their criminal activities. Narcotics smugglers also know that law enforcement can access records of phone calls, and believe that communicating via electronic mail or social networking sites provides greater insulation from law enforcement. Social networking sites and electronic mail are easily accessible from smartphones and

other electronic devices. Because communication via social networking sites and electronic mail is instantaneous, it is convenient for individuals involved in the illicit smuggling and distribution of narcotics to communicate using electronic mail and sites, such as Facebook. These communications may include, but are not limited to, communications referring to smuggling and distribution arrangements, smuggling routes, payment, types of drugs to be smuggled, methods of smuggling, delivery locations, the acquisition of vehicles and/or individuals to operate those vehicles, and photographs, videos, and communications containing the names or co-conspirators and identifiers of communication facilities of co-conspirators, such as co-conspirators' electronic mail addresses and phone numbers.

   c. Individuals involved in drug dealing utilize cellular telephones and "smart phones" to maintain instantaneous contact with co-conspirators and to conduct their criminal activity. Cellular telephones and smart phones contain wire and electronic data concerning telephonic contact, text messages, and electronic mail messages with co-conspirators, as well as telephone books containing contact information for co-conspirators. Members of drug trafficking and distribution organizations also utilize cellular phones and smart phones with photograph and video capabilities to take photographs and videos of co-conspirators, drugs, money, and assets purchased with drug proceeds.

   d. Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their contraband. Drug traffickers often maintain these photographs at their residences or in their vehicles or social media websites such as Facebook.

   e. Individuals involved in drug trafficking often communicate via social media websites such as Facebook, to locate and recruit possible future drivers of narcotic-laden vehicles, communicate with coconspirators and broker the sales of drugs to further drug trafficking enterprises. Among other things, private messages, instant messaging communications, and photographs are stored in the servers of the social media websites, which link to other people involved in drug trafficking activities.

## PURPOSE OF AFFIDAVIT

3. I make this affidavit in support of an application for a search warrant for Facebook, Inc. ("Facebook"), as described in Attachment A, to search the following: (1) Uniform Resource Locator ("URL") www.facebook.com/cristhian.aguirre, Facebook Username CRISTHIAN AGUIRRE, Facebook ID 100016502830317 used by Cristian ARAUJO Aguirre ("ARAUJO") (hereinafter "**Target Account 1**"), and (2) Facebook Username Juan GAMBOA, Facebook ID 100025858838178, (hereinafter "**Target Account 2**"), from June 1, 2018, to August 8, 2018, for items that constitute evidence, fruits and instrumentalities of violations of federal criminal law, namely, 21 U.S.C. §§ 952, 960, 962, as described in Attachment B.

4. The information contained in this affidavit is based on my personal experience and training, consultation with other special agents and other law enforcement officers. The evidence and information contained herein was developed from an interview with the suspect, queries of law enforcement databases, information gained through the use of consent searches, historical cell site records, and personal knowledge of the on-going criminal investigation. Because this affidavit is submitted for the limited purpose of securing a search warrant as described herein, it does not include every fact known to me concerning the investigation.

## FACTS ESTABLISHING PROBABLE CAUSE

5. On August 1, 2018, ARAUJO, a United States citizen, presented himself for inspection at the San Ysidro, California, Port of Entry. ARAUJO was the driver and sole occupant of a vehicle. During the inspection, Customs and Border Protection Officers (CBPOs) located 61.9 pounds of a mixture and substance containing a detectable amount methamphetamine, 14.52 pounds of a mixture and substance containing a detectable amount of heroin, and approximately 11,490 pills containing fentanyl in the firewall, quarter panels, and spare tire of the vehicle.

6. I made contact with ARAUJO and advised ARAUJO of his Constitutional rights per Miranda, in the Spanish language. ARAUJO stated that he understood his rights and was willing to waive his rights and make a statement.

7. During the interview, ARAUJO denied knowledge of the narcotics discovered in the vehicle during his arrest. ARAUJO stated that at the request of a friend, he was driving to Chula Vista to pick up a pregnant woman at a hospital to bring her back to Mexico. ARAUJO stated that he was communicating with his friend via Facebook and Facebook Messenger in connection with this trip.

8. ARAUJO was arrested and charged with a violation of Title 21, United States Code, 952, 960, and 963, importation of a controlled substance.

9. Incident to the arrest of ARAUJO, CBPOs seized a smartphone. A smart phone is a mobile phone with advanced mobile operating system that combines features of a computer operating system with other features useful for mobile use. The smartphone was later turned over to the custody of HSI. ARAUJO stated that he logged into Facebook Messenger from the smartphone. Agents received consent from ARAUJO to search the smartphone, which showed that ARAUJO sent and received messages through Facebook Messenger the day before and day of his arrest. ARAUJO also received several messages and calls through Facebook Messenger immediately after his arrest on August 1, 2018.

10. Agents subsequently downloaded the smartphone on August 3, 2018. Agents reviewed the results of the download and discovered that ARAUJO's Facebook Username is CRISTHIAN AGUIRRE (cristhian.aguirre.77398) and ARAUJO's Facebook ID is 100016502830317. Agents also discovered that ARAUJO previously had contact with Facebook Username Juan GAMBOA, Facebook ID 100025858838178. There appeared to be discussions about smuggling money exceeding $10,000 into the United States. The job would involve the courier making $2,000 with an additional $500 if he had a ready lane or sentri pass. The job was described as "easy" and "not drugs, not people."

11. Records show that ARAUJO previously crossed the border as a pedestrian on or about July 24, 2018.

4

## FACEBOOK, INC.

12. Facebook, Inc. is an Internet company which, among other things, provides electronic communication services to its subscribers. Facebook's electronic mail/communication service allows Facebook subscribers to communicate and share with other Facebook subscribers and with others through the Internet. Facebook subscribers access Facebook's services through the Internet.

13. Subscribers to Facebook use screen names during communications with others. The screen names may or may not identify the real name of the person using a particular screen name. Although Facebook requires users to subscribe for a free Facebook account, Facebook does not verify the information provided by the Facebook subscriber for its free services.

14. At the creation of a Facebook account and for each subsequent access to the account, Facebook logs the Internet Protocol ("IP") address of the computer accessing the account. An IP address is a unique address through which a computer connects to the Internet. IP addresses are leased to businesses and individuals by Internet Service Providers. Obtaining the IP addresses that have accessed a particular Facebook account often identifies the Internet Service Provider that owns and has leased that address to its customer. Subscriber information for that customer then can be obtained using appropriate legal process.

15. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

16. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval),

5

physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

17. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

18. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

19. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which

is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

20. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

21. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

22. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

23. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

24. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

25. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

26. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

27. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

28. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

29. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

30. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future

8

and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

31.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

32.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

33.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's "Neoprint," IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or

9

controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

34. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

35. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be severe.

36. Therefore, I request authority to seize all content, including profile contact information, mini-feed, status update history, shares, notes, wall postings, friend listing with friend's Facebook ID, group listing with Facebook Group ID, future and past events, and video listings with filename; User Photos (referred to as User Photoprint); Geo-tags; Group Information; Private Messages; IP Logs; and any other content from the Facebook accounts, as described in Attachment B. In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure. That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to Attachment B. Relevant data will be copied to separate media. The original media will be sealed and maintained to establish authenticity, if necessary.

37. Analyzing the data to be provided by Facebook requires special technical skills, equipment and software. It also can be very time-consuming. Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process. Certain file formats do not lend themselves to keyword searches. Keywords search text. Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text. The data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

38. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data

will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

39. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

40. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

## SEALING REQUEST & PRECLUSION OF NOTICE

41. This is an ongoing investigation of which the target(s) (is)(are) unaware. It is very likely, based upon the above, that evidence of the crimes under investigation exists on computers subject to the control of the targets. There is reason to believe, based on the above, that premature disclosure of the existence of the warrant will result in destruction or tampering with that evidence and seriously jeopardize the success of the investigation. Accordingly, it is requested that this warrant and its related materials be sealed until further order of the Court. In addition, pursuant to Title 18, United States Code, Section 2705(b), it is requested that this Court order the electronic service provider to whom this warrant is directed not to notify anyone of the existence of this warrant, other than its personnel essential to compliance with the execution of this warrant, absent further order of the court.

## CONCLUSION

42. Based on the foregoing, I submit that there is probable cause to believe that the items identified in Attachment B have been used in the commission of a crime and constitute evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 952, 960, 963 and that the foregoing will be found on the premises searched, as identified in Attachment A.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Jill Brenny
Special Agent
ICE/HSI

Sworn to and subscribed before me this 20 day of August 2018

_____
THE HONORABLE WILLIAM V. GALLO
United States Magistrate Judge